Our next case is 22-7025 United States v. Stewart. Counsel may enter an appearance and proceed. Good morning. Good morning. Counsel. May it please the court. My name is Stewart Southerland. I'm an assistant public defender for the Eastern District of Oklahoma, representing James Michael Stewart in this action. Given the limited amount of time that we're going to have, I would like to focus on the second proposition of error. Could you pull the mic up closer to you? Thank you very much. I would like to discuss the second proposition of error that I raised in my brief. That is the erroneous exclusion of Dr. James Beaman as an expert witness and how that affected his right, Mr. Stewart's right, to present a meaningful defense. In that vein, I'd like to focus on why Dr. Beaman's testimony was important. The judge only really addressed one factor relating to his testimony. The judge ruled that he was going to exclude the testimony of Dr. Beaman because it invaded the province of the jury, essentially finding that it would not be relevant and would not be helpful for the jury. I thought he also touched on, in his questioning, that it appeared that the expert would be opining, basically, as to the credibility of witnesses. Exactly, and I'm not discounting that as being a relevant issue in this case, but I think that probably if we were to list the purposes that went through the offer of proof that we list the other purposes, they were, in fact, more important, really, than even the credibility issue. The credibility issue, while important, I think, in the Heather Drywater case was probably more relevant in the other case, the Sarah Boston case, with regard to her credibility. First and foremost, the voluntary intoxication issue was a primary defense. It was a defense that the jury was actually instructed on as to whether or not Mr. Stewart was intoxicated, and they were allowed to consider the effects of intoxication with regard to intent. That is something that Dr. Beaman would have addressed. I think that this is different, say, than like a driving under the influence case or something like this, where a person's intoxication and how it affects a person's ability to operate an automobile is a little bit easier to understand. I think Dr. Beaman had a lot that he could offer to the jury in this case. Is there a purpose to explain the defendant's behavior or state of mind or the victim's behavior or state of mind? I think both, but I think what I'm focusing on right here is probably, and certainly with the defense of voluntary intoxication, that would be the defendant's behavior. But even more important probably than that, the government made this relevant. When they presented the testimony, Lieutenant Dean, who took it upon himself to describe what blackout drunk meant to him, now, had Dr. Beaman been able to testify, he would have established that Lieutenant Dean really didn't know what he was talking about, and blackout drunk was something else entirely, but what blackout drunk meant to him... Is that some kind of medical term, or what's... Far be it for me to define it as well as Dr. Beaman could, but it certainly, blackout drunk actually relates to a person's ability to store memories and remember what happened, as opposed to... So that is a medical diagnosis? I don't know if it's a diagnosis that can be treated, it's a condition. It's just a generic description that people throw around. So if it's that, I don't think you need an expert witness to say, yeah, when he uses that slang term, that's really what he means. Well, I mean, I think it was important for Dr. Beaman to come forward and testify that what he's not talking about is blackout drunk being intoxicated to a level to where as he knew what he was doing in this case. In fact, blackout drunk was something that a person wouldn't even be able to observe just from observation. Lieutenant Dean tried to point out, tried to make it clear that blackout drunk was something to the level of where a person would be defecating on themselves, would be urinating on themselves, in effect minimizing the intoxication level of Mr. Stewart in this case. Did the jury see the videos of the encounter with the police entering into the... They did. They saw an awful lot more. ...the interaction with your client? They saw a little bit. I think at the very beginning, this would have been exhibit number five, I believe, when they first walk into the room. They could certainly see that Mr. Stewart was intoxicated. And you know, Lieutenant Dean didn't deny that. It would have been ridiculous for him to get up there and say that he wasn't intoxicated. Right. Wasn't the jury then in a position to gauge the level of intoxication of the defendant and make some inferences from those interactions? And you know, had Dr. Beeman testified, had Lieutenant Dean not established what he established, which was that in his 10 years of experience, this person was not blackout drunk, which like I say, in this case was kind of shorthand for really, really drunk, so drunk that he didn't know what he was doing. Wouldn't Beeman say he was more drunk than he looked on the video? Am I misunderstanding the theory there? I thought you wanted to establish that the defendant was so intoxicated that he couldn't form the specific intent to commit attempted rape. Well, he certainly would have been able to give the jury the tools which they could have made that determination. I don't think any of us would have argued that. Am I right that Beeman was going to testify that the defendant was more drunk than he might have appeared to the police officers? Sure. Sure. I think that he would have been able to say that the blackout drunk analysis that Lieutenant Dean made was something that couldn't be made just from looking at him. Although, did Dr. Beeman examine the defendant, you know, weight, ability to consume alcohol, which differs from people to people, those sorts of things? He did not. I mean, this was what is often termed, I don't know if I've read it in any of your cases, but what we call in the district court as a blind witness, somebody who hadn't examined the defendant or, for that matter, had not examined the defendant. Why would that, why would a blind witness here be helpful if the characteristics of the defendant and the victim were important to their capacity to function while intoxicated? If that's part of the case, then why shouldn't the expert have been expected to judge the particular personal characteristics of these two people? And that is part of the case. But I think, after looking at this case for months now, I think maybe the most important thing that Dr. Beeman might have been able to do would have been to have addressed some of the behavior of Heather Drywater. Heather Drywater was in an exaggerated emotional state. She was very, very upset. And that's something, boy, that went on for maybe 10, 15 minutes when you look at all the video of Heather Drywater. The jury certainly got to see video of her and how upset that she was. And it was something that the prosecutor was able to capitalize on. I think, very simply, they were able to argue in closing that had she not been sexually abused, had there not been some kind of sexual assault here, why would the defendant have known that she had been so upset? And that's something that Dr. Beeman would have been able to address in his report. Could a blind expert make that assessment? Sure. Sure. I mean, I think you can make general testimony about how alcohol, while we all can understand that it may slur your speech and stagger your gait, that alcohol can have other effects on a person. And one is exaggerated emotional reactions. And the part of us... Isn't that within common knowledge? I don't think it would be common knowledge. Certainly, when there wasn't anything to controvert to the prosecutor's argument in close, that her exaggerated emotional state was solely, obviously, must have been because she was sexually abused, I think the expert witness, Dr. Beeman, would have had a great deal of value in being able to testify that intoxication would have been an alternate explanation for that. And also, I think that we kind of assume that since we hear these cases, since we defend these cases, that people have maybe a higher understanding of alcohol intoxication than they do. If you remember, there were a couple of people during Vordaer, one of which who had never had anything to drink, who during the brief Vordaer said that they hadn't had anything to drink, another that had never been intoxicated. So like I say, while I think there may be a more common understanding with regard to something like driving under the influence and operating a motor vehicle, I think when we start talking about the nuances in this case, particularly the exaggerated emotional state, I don't think that's common knowledge. Was the proffer of the expert, in part, was he going to testify that in his opinion, Mr. Stewart lacked the specific intent to commit the crime? I don't think he could have said that, but he could have said that based on the way alcohol affects the brain, that it would have affected his ability to form the specific intent. And I think that given what Lieutenant Dean testified to, that was negated. The ability to argue that was severely compromised. What's your best case that demonstrates that an alcohol expert would be permitted in these circumstances? Judge, having a background in Oklahoma, and I think this actually went up the Tenth Circuit, there was a case, Coddington, I think, versus State, 959 F. 3rd 947. It doesn't necessarily establish the mandatory nature, and certainly that case did not reverse because of harmless error, but it did quote language from the Oklahoma court that said the defendant was entitled in that case. I think it was a first-degree murder case, so we still had the specific intent element. Was unable to form the specific intent. Now, it was different. It wasn't just alcohol. I think it was a combination of drugs, and certainly the expert in that case was able to testify as to the synergistic effect of the drugs and whatnot. But I do believe that there's authority that an expert witness on intoxication is relevant. And just briefly, because I think it's important to talk a little bit about the relevancy, because I think it dovetails. I think had this not been the case that it is, and we are arguing in our first proposition of error that the evidence was insufficient, and the evidence was insufficient, it's not just a question of fact for the jury, because this was an attempt case, and the attempt instruction is quite specific. The intent instruction talks about not just that the defendant intended to have sex with Heather Drywater, because I think that that's pretty much established, but I think that somewhere the court, the government, the jury, led to this conclusion that because he intended to have sex with Heather Drywater, and this action where he pushed her up against the bed and fell on her, that that necessarily meant that he was going to have sex with her against her will. And the evidence did not support that. The evidence requires a substantial step towards the commission of a crime, not just to have sex, but the commission of a crime. Well, he lifts her up. He is naked. He lifts her up, puts her on the bed, gets on top of her. He does. And lays on top of her and tells her that he wants to have sex with her in a pornographic way. And then she manages to wiggle out from under him. Well, you say manages to wiggle out. Don't we have his actions that tell us a little bit about his intent? Well, his intent to have sex with her. But if you also remember her actions, there's a lot of discussion and argument about struggling. The first thing that she did, she didn't say to get off of me. She didn't say, I don't want to do this. The first thing she did was push. So that's the only way that you can say that it's not consensual is to verbalize, stop, no, don't do this? No, it's one way. The way she did it was to push him up. And when she pushed him up, because he wasn't pinning her down. He didn't have her arms. As he pushed her, as she pushed him up, she was able to slip out from under him. So the first thing that she did, the first physical reaction to what she did to say that I don't want to do this. He reacted by lifting up and allowing her to withdraw. And if I may, I'd like to leave the brief time I have left to rebut unless you have questions. Lisa Williams here representing the United States of America, appearing for the Eastern District of Oklahoma. I'd like to start with court left off, which is the analysis with count issue one and the intent and what I thought was really important to draw the court's attention to because it gets muddled in the briefing, is this idea that defendant is advancing that somehow he voluntarily lifted off Heather while they were on the bed together. There, the trial testimony, which I am going to read to you because I didn't want to get it wrong, is absolutely clear that is not what happened. Heather was asked, OK, I just want to be clear. From your perspective, did the defendant raise up voluntarily or because you pushed him? And Ms. Drywater responded, because I had pushed. So nowhere in the record is this notion that we see in the opening brief and the reply brief that the defendant, as soon as he got an indication that Ms. Drywater didn't want to have sex with him, lifted up his body and moved so that she could exit underneath him. That is not in this record. What is in this record is that this defendant pummeled Ms. Drywater onto the bed, put her legs up in the air, put his full weight of his naked body on top of her, began dry humping her, said that he wanted to fuck her. And it was only the dry humping part. Where do we get that information? So that's from Exhibit 6, Your Honor. And that is the interview that or the body cam video from when Ms. Drywater is talking to Lieutenant Dean. And he is kind of going through what happened. And he said, they're talking about what she should put in her written statement. And he says now, and he was dry humping you and saying crude things in your ear. She says, yes. So, yes, that so that descriptive phrase comes from law enforcement, not from her. But then she agrees that that is what happened. And then that dovetails into the next issue. You know, the defendant is really asking this court to weigh the relative merits of the evidence submitted at the trial. We see repeatedly in the briefing that if Ms. Drywater didn't testify to something specifically at trial, they want this court to give it less weight. They want the court to discount what was said on Exhibits 5 and Exhibit 6 and in the 911 call. And the standard when reviewing a Rule 29 motion is that this court doesn't engage in such weighing of the credibility of the evidence. The evidence is the evidence is the evidence. And in this case, there's significant evidence of his intent to engage in that act. An analogy I thought of is is think I started up as a drug prosecutor. So I always go back to what I know. But think of a guy standing with a kilogram of meth in his hand and there's a customer in front of him. He says, I would like to distribute drugs to you. Wow. Is that powerful evidence of his intent to distribute? And that's why the government says that that phrase, I want to fuck you, is powerful evidence of his specific intent of exactly what he wanted to do with Ms. Drywater. You know, it's a it's an odd fact pattern. This isn't like a random one night stand encounter. We have nine or 10 previous situations where they're drinking together. He's naked in a hotel room with her. He's in a he's naked in a bed with her on previous occasions. And and then, you know, it culminates with his, you know, maybe a belief that she's available. But, you know, however you want to want to frame it from his perspective. And, you know, and so he makes an aggressive pass and she pushes him away and and he takes that as the no and and it's over. You know, she obviously goes into the bathroom and is extremely upset and calls 9-1-1. But, you know, it's not it's not your random meth case. It's a little more contextual. It's not. It's highly contextual, Your Honor. I agree. Absolutely. Which is why it went to a jury trial and the jury was able to sort through all of this evidence and make that credibility determination about what exactly the defendant's intent was that night and whether or not the government proved its case. You know, when Ms. Drywater gets into the bathroom, there's a whole bunch of other evidence that I think speaks and gives context to exactly what happened in the bedroom. She says that he scared the shit out of her. He was very aggressive, really forceful. He forced her legs open. She was unable to defeat him. She thought she was going to get raped. And then again, the defense says that she backs off of that. But she did that because this is her friend. And she says that on the video. I don't want to get him in trouble. I just want to be safe. And I thought this terrible thing was going to happen to me. And the jury heard that. They heard her testify and they made a credibility determination that her fear that night was real, that the defendant was intending to sexually assault her. That's pretty persuasive. That kind of dovetails to the other issue and that is that maybe Mr. Stewart's only hope here is to explain that her emotional state was exacerbated by alcohol consumption. And that he was he was so drunk that he didn't know or remember what he was doing. And doesn't that really accentuate the importance of the expert here to their theory of the case? It would, Your Honor, if that expert were able to offer any type of opinion on Ms. Drywater's state of intoxication. But this expert, Dr. Beamer, would not be able to because he is a blind expert. He knows nothing about Ms. Drywater. He knows nothing about how much alcohol she consumed that night. He knows nothing about her weight, what she had to eat to make that analysis that she was so intoxicated that she could have been in a heightened emotional state. He can't give that opinion. All he can do is say sometimes when some people consume a certain amount of alcohol, they might get more emotional. That might be less credible. But why is that relevant? Because it's it's not relevant because, well, it's it's relevant, but it's not necessary for expert testimony because then that, of course, is common sense. And and so there's there's the two competing issues that the government believes is one, it's not specific to the case and therefore the generalized testimony isn't relevant. And then when you pick apart what the generalized testimony really is, it's not helpful to the trier of fact because these aren't complex scientific concepts that the jury needs an expert to testify about. And then the third kind of subset is that is so what he's really saying is you shouldn't believe Ms. Drywater and all these these emotions are not credible. They're not because she was sexually assaulted there because she was drunk. And then that's the kind of the credibility argument where he starts invading the jury's province. I also wanted to point that out. You know, defense counsel gave an offer of proof. And then there's the exchange with the court about what Dr. Beeman would testify to. And the court goes and Dr. Beeman's testimony is going to the issue of whether or not their testimony, the defendant and the victims, their testimony and description of events is believable. And the defense attorney says that as well. So before the district court, the defendant, the defense counsel admitted that Dr. Beeman's testimony is going to the issue of whether the defendant and the victim are credible. That is the type of credibility determination that expert testimony is not allowed to get into. Didn't the prosecution really open the door to that by eliciting the officer's testimony that he wasn't blackout drunk? And, you know, it's, you know, whatever it means, what it means, I suppose. But you're getting a lay opinion from the officer that probably has a lot of weight with the jury because I'm sure he encounters a lot of drunk people. And the expert would rebut that. And who else could rebut it for the defense? Your Honor, that is an excellent question. I wasn't involved in the case. I'm just appellate counsel. And so I went back and said, how did this issue of blackout drunk even get interjected into this trial? And you know who brought it in? The first person to mention blackout drunk was defense counsel during opening statements. And you know who the second person to bring it in? Defense counsel during the cross-examination of the victim. So to argue that the government somehow- How did it come in in those two instances? With the cross-examination? With what was said in the opening statement? Opening- it's page 13 of the transcript. And they talk about how you're going to hear that Heather Drywater gets blackout drunk. He thought he had an expert in his hip pocket at that point, right? He- I'm not going to speculate as to what defense counsel was thinking. But he- well, he listed Beeman as an expert, right? I think that's probably- And there was no pretrial- I think that's probably what happened. But to come before this court and try to say that the government interjected the issue of blackout drunk by soliciting that testimony from Lieutenant Dean is not what happened at the district court. We first hear blackout drunk from the defense during opening and then on cross of the victim, who is the second witness? And what happens then? Then, after defense counsel has now repeatedly talked about blackout drunk, Lieutenant Dean is the third witness that testifies. And that's when the government says, hey, do these people seem blackout drunk to you? Using the defense counsel's- I mean, what happened? Did you say what happened during the cross-examination of the victim? I know what happened during Dean's. During the cross-examination, the defense attorney asked Mr. Drywater, had she been blackout drunk before? Was she blackout- you know, was she familiar with being blackout drunk? I remember there's at least four references to blackout. The question was to ask her, essentially, if her common knowledge included the term blackout drunk. Correct. Yes, Your Honor. I think that's a fair assessment. And what was her response? I believe she said, you know, sometimes she had, but not always, that she's been blackout drunk before, but not every time she drinks. It seems that she knew what- well, she certainly had her own idea of what blackout drunk meant, right? And it's probably- Did she ever describe it? I don't know. I don't believe she did, Your Honor. So then we have this phrase, which- And the officer adopted it, too, though, right? Right. Yes, Your Honor. And then that's when Lieutenant Dean, so third witness, then the government. And I think at that point, rightfully so, right? It's some rebuttal at this point because we're hearing this phrase, blackout drunk, tossed around an opening and during the cross of the victim to ask the responding officer, hey, did anybody seem blackout drunk to you? And I think it's also interesting. The first witness was the first officer. You know, there's two responding officers. And the government never brings up this issue of blackout drunk with the first officer. It's only after Ms. Drywater is subject to the cross where the defense attorney is talking about blackout drunk that we hear it. But there's simply nothing about this defense that requires an expert. His defense is, I was too drunk to know what I was doing. And he got his jury instructions. He would say that heavily intoxicated people have memory cognitive issues, which would support his defense that her testimony was faulty or, you know, his action was involuntary. I'm not sure that it's the memory is faulty. It's really just that she was so emotionally charged because she was drunk, not because she was sexually assaulted. And of course, the other argument to that is, or she was emotionally charged because she was almost sexually assaulted. And so I'm not sure how much influence that's going, how much of a point that is. But I would cite to the Adams case, which is the case where they denied the expert on borderline personality and the effects of alcohol consumption. And the guy wanted to admit, say, his confession was a lie because he wanted to protect his girlfriend. And the court said, you don't need an expert to make that argument. Right. That's common sense. Like you're lying to protect your girlfriend. So is this. I didn't know what I was doing because I was so drunk. That's his defense. He has this jury instruction. And that doesn't take an expert to communicate that line of reasoning to the jury. Especially because this expert couldn't even offer any type of opinion on how intoxicated the defendant was. And I would also note, you know, we're acting like these people were really heavily intoxicated. The record shows that they got to the hotel at 2.30. The police show up at 6.30. The 9-1-1 calls 14 minutes. So maybe the assault happens around 6 a.m. But that's three and a half hours. And they each drink six beers. Well, nearly. They nearly finished the 12th pack. They don't even finish a 12th pack. And we know from the video from seeing. They closed down a bar before that. Well, but they tried. You know, it's very unclear how much. I don't think the record is clear how much they drank before that. They were hopping from bar to bar to bar to find someone to serve them. And then bars close. And then they go to the hotel room. And I forgot. I believe it's Mr. Stewart drove him there. So I'm just I don't think the record is that strong that these people were so heavily intoxicated. I think that's an assumption that defendant is arguing to the court. I'm not sure that the record supports that. And I see that I'm out of time. Thank you, counsel. We appreciate that. Mr. Subtle Injustice and Rebuttal. Very quickly, with regard to the Adams case, I thought it was interesting and I didn't read every case, but the cases that I read dealing with this issue, I didn't see one where they totally excluded the expert. They could have limited Dr. Beeman had the judge wanted to do that to credibility. And he still could have testified about the other things he could have testified. Did you find a case that involved an expert that addressed intoxication? The Coddington case did, but it was it was a habeas issue and it was it was a different issue. But that certainly that was a case involving it. And, you know, bless Lieutenant Dean's heart. I mean, we mentioned the dry humping, which was over and over again mentioned throughout the case. It was a compound question. I mean, it was a question of, did he say, did he tell you that he wanted to fuck you? And was he dry humping you? And her response was, yeah, yeah. We don't know what she was responding to. And yet she didn't testify to it. And then words never came out of her mouth. Another point, I think, is that this is an equivocal act. We have to remember this is an equivocal act. His intent was either to have sex with her or to have sex with her against her will. Any other example we can think of, whether it would be child sexual abuse or distributing an illegal drug, there's only one thing. I mean, if I'm attempting to sell you cocaine, that intent to sell you cocaine is a crime. That intent to have sex with the child is a crime. This is equivocal. And those words are in the attempt instruction. Has to be an unequivocal substantial step. There was no testimony about legs being spread. She said in the recorded statement up front that he pulled her legs up, that he lifted her up. And that's how she fell on the bed. And finally, United States versus Charlie, that addresses blind experts with regard to child abuse, child sexual abuse. And the argument is that that kind of testimony as opposed to what actually happens normally in typical circumstances is admissible. Thank you. Thank you, counsel. Counselor, excuse me. Appreciate your arguments. Case is submitted.